SOUTHERN TRUST COMPANY *v.* AMERICAN BANK OF COMMERCE & TRUST COMPANY.

Opinion delivered April 18, 1921.

1. BANKS AND BANKING—FORGED INDORSEMENT OF CHECK—LIABILITY OF DRAWEE.—The payee of an unaccepted check can not maintain an action upon it against the bank on which it is drawn, and the unauthorized payment by the bank on a forged indorsement does not constitute an acceptance.

2. BANKS AND BANKING — LIABILITY ON FORGED INDORSEMENT.— Where a bank, by direction of a depositor, issued a cashier's check to a creditor of such depositor, but, through negligence or mistake, delivered the check to another person who impersonated the payee, and the bank subsequently paid the money out on a forged indorsement of the check by the person to whom the check had been delivered, the bank did not become liable to the creditor; there being no acceptance of the check.

Appeal from Pulaski Chancery Court; *J. E. Martineau*, Chancellor; affirmed.

*S. L. White*, for appellant.

At the time garnishment was served on appellee it had money in its hands for the purpose of paying Smith and it had never been paid out on his check or order and Smith had a right of action against the bank. 69 Ark. 43; 216 S. W. 717; 5 Cyc. 548; 92 Tenn. 154; 183 S. W. 684. See, also, 70 Penn. Sup. Ct. 34. The exact question here has been settled by this court. 98 Ark. 1; 100 *Id.* 537; 133 *Id.* 498. Appellee is indebted to Smith and (2) between Smith and appellee there was and is privity. Smith could maintain suit against appellee, and appellant acquired this right against appellee. Appellee still has in its hands money deposited to pay Smith. This was a trust fund for Smith against which it issued its own checks or obligations, which have never been paid

Smith but paid some one else on forged indorsements, and appellee has recourse on the banks that cashed them.

*Moore, Smith, Moore & Trieber,* for appellee.

The transmittal of the telegraphic orders to and the receipt by the bank in no way operated to create any relation of privity between the bank and Sam Smith or Sam W. Smith. The bank paid the money to the party designated and charged it to him. The fact that the order was sent direct to the bank, instead of the payee, created no difference in legal effect. 130 Pac. 29. The precise question here has been determined by this court. 98 Ark. 1; 100 *Id.* 537; 133 *Id.* 498. The giving a check upon a bank is not assignment *pro tanto* to the payee upon which he can bring suit against the bank for payment, there being no privity between the drawee bank and the holder or owner af the check until the check is accepted. 133 Ark. 498 and cases *supra.* See, also, 136 Pac. 935; 79 S. W. 968. This case is ruled by 100 Ark. 537 and 133 Ark. 498.

McCULLOCH, C. J. Each of the parties to this appeal is a banking corporation doing business in the city of Little Rock. Appellant obtained a decree in the chancery court of Pulaski County on October 11, 1920, for the recovery of the sum of $9,655.55 against Sam W. Smith and Arthur Nicholl, and later sued out a writ of garnishment directed to appellee commanding the latter to answer what funds and property of Sam W. Smith it held in its possession. Appellee answered that it had no property or funds of Smith in its possession, and appellant filed a reply, which framed the issue tried by the lower court, resulting in a decree of the court discharging appellee as garnishee.

The primary question in the case is whether or not Sam W. Smith had a right of action against appellee, for appellant's right to recover from the garnishee is dependent upon the right of Smith, one of the defendants in the judgment. The material facts are undisputed.

Nicholl was the Little Rock agent of Shepherd & Gluck of New Orleans, and Smith had dealings with Shepherd & Gluck through Nicholl whereby Shepherd & Gluck became indebted to Smith on January 9, 1920, in the sum of three thousand and fifty-six dollars and fifty-six cents. Shepherd & Gluck had a checking account with appellee, and on the date last mentioned they sent to appellee from their office in New Orleans a code telegraphic message directing appellee to pay to Sam Smith the sum of $3,056.56, and charge the same to their account. The telegram also stated that they were transferring to their credit at appellee's bank the sum of $3,000 from another bank in Little Rock to cover the draft. Before the receipt of this telegram by appellee, Nicholl telephoned to appellee's assistant cashier, who handled such matters, stating that he (Nicholl) was expecting that appellee would receive a wire that day from Shepherd & Gluck to pay Sam Smith $3,056.56 and asked that he be informed by telephone when the message came, and when the message came the assistant cashier telephoned the information to Nicholl, who replied that he would send Smith around to the bank at once to receive the money. This employee of the bank was a witness in the case and testified that he did not know Smith and so informed Nicholl, but that the latter described Smith to him, and a few minutes afterward a man came into the bank representing himself as Sam Smith and produced a note from Nicholl identifying him as Sam Smith and directing that the sum be paid to him. The assistant cashier, not doubting that the individual who presented himself was Sam Smith, gave him what is termed a cashier's check for said amount, *i. e.*, a check signed by the cashier on that bank for the amount specified. The individual who received the check was not, according to the testimony, the Sam W. Smith who was entitled to receive it, but he afterward deposited the check with another bank in Little Rock, who presented it to appellee, and it was collected, the check having been properly indorsed by someone under the name of Sam Smith.

There was another transaction of precisely the same kind which took place on February 19, 1920, involving the sum of four hundred twenty-nine dollars and seventy-two cents. In this instance the man presenting himself as Sam Smith was sent around to the bank by Nicholl with a note identifying him, directing the payment of the sum to him, the same as in the former instance. Sam W. Smith testified as a witness in the case, and it is shown by his testimony that he had never received either of the amounts specified above, which were due him originally by Shepherd & Gluck, and which sums were specified in the two messages above.

The telegraphic message from Shepherd & Gluck can only be treated either as a private direction from the former to the latter as their agent, or as the equivalent of a written check or order for the payment of the money. In neither event was there any privity between Smith, the payee, and appellee, the drawee of the check, so as to give Smith a right of action against appellee for the recovery of the amount. We think that the message was the equivalent of a written check for the payment of the money, and that its effect was the same as if it had been delivered to Smith, instead of being sent direct to appellee. Treating it in this way, the check did not operate as an assignment of the funds, so as to empower Smith to sue for the amount. It has become the settled doctrine of this court, announced in repeated decisions, that the payee of an unaccepted check can not maintain an action upon it against the bank on which it is drawn, and that the unauthorized payment by the bank on a forged indorsement does not constitute an acceptance. *Sims* v. *American National Bank,* 98 Ark. 1; *Rogers* v. *Farmers Bank,* 100 Ark. 537; *State* v. *Bank of Commerce,* 133 Ark. 498. In thus holding to this rule we have followed the Supreme Court of the United States in the case of *First National Bank* v. *Whitman,* 94 U. S. 343, and what appears to be the great weight of American authority. The case of *Schaap* v. *First National Bank,* 137 Ark. 251, is in no wise against this rule, and

the facts of that case are distinguished from the facts of the other cases now cited. In the Schaap case a bank other than the drawee bank cashed checks upon unauthorized endorsements and collected the same from the drawee bank. We held that the owner of the checks had a right to repudiate the endorsement without repudiating the collection, which was for his benefit, and that he could recover from the collecting bank the amount received on the checks from the drawee bank.

In reaching that conclusion, we said with reference to the other decisions and the Whitman case, *supra,* this: "In that case the court held that payment to a stranger upon an unauthorized indorsement does not operate as an acceptance of the check, so as to authorize an action by the real owner to recover its amount as upon an accepted check. We do not think that our holding in our own cases above cited or the holding in the Whitman case is in conflict with our holding in the present case. * * * As we have already seen, Slates, the agent of the plaintiff, had no right to indorse the checks in the plaintiff's name, and the plaintiff's right to the checks remained precisely as it was before Slates undertook to endorse them for him. The checks therefore, when received by the defendants, were the property of the plaintiff, and in that case he may, as we have seen, ratify the action of the banks in receiving the checks and collecting their proceeds without ratifying the unauthorized act of his agent in indorsing the checks in the name of the principal."

But counsel for appellant, conceding such to be the rule of our court, contends that the issuance of the cashier's check in the name of Smith, the true owner of the original check, was equivalent to an acceptance of the original check and converted the funds into a deposit to the credit of Smith, the real owner. The frailty of this contention is that, while the bank, through negligence or mistake, delivered to another person, who falsely impersonated Sam W. Smith, the check which was intended for the said Smith, yet the bank delivered the check to the particular individual it intended to receive it and paid

it on the indorsement of that person. The fact that a mistake was made in delivering it to the wrong person does not alter the material circumstance that the bank paid the money out on the check to the person to which it had originally delivered it, and it was therefore not liable to the real owner. The case in this respect is ruled by our decision in the recent case of *Cureton* v. *Farmers' State Bank*, 147 Ark. 312. In that case a depositor gave a check through mistake to one who was falsely impersonating the man whose name was written in the check as payee, and, in a suit by the depositor against the bank to recover the amount of money paid out on the forged indorsement, we held that there was no liability for the reason that, notwithstanding the mistake of the depositor in giving the check to the wrong person, the bank had paid it out to the person to whom the depositor had given the check. The same rule of reasoning is, by analogy, applicable to the facts of this case for, notwithstanding the fact that appellee made a mistake in giving the check to the wrong person, it paid the funds out to that person on the check, and it can not be said that the delivery of the check to another person would constitute a deposit of the funds in the name of the party to whom the original check belonged. See, also, following cases: *First Nat. Bank* v. *Bank*, 170 N. Y. 88; *Slattery & Co.* v. *Bank*, 186 N. Y. Supp. 679; *Robertson* v. *Coleman*, 141 Mass. 231; *Heavey* v. *Com. Nat. Bank*, 27 Utah, 222. 101 Am. St. 966. By no process of reasoning can it be said under these circumstances that the true owner of the original check can affirm the receipt of the cashier's check by the impostor and thereby become the owner of the deposit. If there could be any theoretical ratification at all by the owner of the original check, it was merely a ratification of the act of the false impersonator in receiving the check, and, if there be such a ratification, he could look alone to that person for reimbursement. Certainly the act of the bank in giving the cashier's check to the false impersonator could not be

ratified so as to constitute the bank the holder of the deposit for the benefit of the owner of the original check. The act of the bank in delivering the cashier's check to Smith's false impersonator was of the same effect as if it had paid the money directly, instead of giving a check to the impersonator, and for the reasons stated in our former decisions such a payment can not be treated as an acceptance of the check.

Our conclusion is, therefore, that the decree of the chancellor is correct, and the same is affirmed.

HART, J. (dissenting). It seems to me that the principles of law decided in the cases cited in the majority opinion, when applied to the facts presented by the record, warrant a reversal of the judgment.

This court has held that there is no privity of contract between the holder of a check or draft which has been paid by the drawee bank upon the forged indorsement of the payee, which would entitle him to bring suit against the drawee bank, and that its action in the payment of such draft does not constitute an acceptance thereof which releases the drawer from its payment. *Sims* v. *American National Bank of Fort Smith,* 98 Ark. 1, and *State* v. *Bank of Commerce,* 113 Ark. 498.

So in this case, if Shepard & Gluck had drawn a draft on the American Bank of Commerce & Trust Company in favor of Sam Smith for the amount they owed him, and this draft had been persented to the bank by another Sam Smith and cashed, the bank would not have been liable to the real Sam Smith. Because the bank paid the draft on a forged indorsement of the payee's signature to a person not authorized to receive the money, it does not follow that the bank promised the payee to pay the money again to him, on the presentation of the check by him for payment.

In the instant case, however, the facts are essentially different. Shepard & Gluck in each instance telegraphed the bank at Little Rock to pay a stated sum of money to Sam Smith and charge their account with it. Shepard

& Gluck actually transmitted the money to the bank. The bank drew a cashier's check in favor of Sam Smith and credited the man supposed to be Sam Smith with the amount represented by the check. The account of Shepard & Gluck was charged with the amount. The issuance of the cashier's check charging the amount to the account of Shepard & Gluck fixed the liability of the bank. The issuance of a cashier's check by the bank charging the amount to the account of Shepard & Cluck constituted an accepted order for the money.

Neither do the facts of this case bring it within the rule announced in *Cureton* v. *Farmers' State Bank,* 147 Ark. 312. If Shepard & Gluck had drawn a check on appellee bank in favor of Sam Smith and delivered it to an impostor, who had presented it to the bank and obtained payment thereon, the case in question would be applicable. In such a case the bank would pay the check to the person the drawer of the check had intended it to pay, although the drawer of the check had made a mistake and had drawn the check to the wrong person. The facts in the present case are altogether different. Shepard & Gluck did not draw a check in favor of Sam Smith and deliver it to the supposed Sam Smith who in turn presented it to the bank for payment. But Shepard & Gluck directed the bank to pay Sam Smith, their debtor, and the bank paid the money out to another person. It did not pay the money to the person whom Shepard & Gluck directed it to pay.

Therefore, the bank, having charged the amount to Shepard & Gluck, is liable to the real Sam Smith, or his assignee.